IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>SCOTT MITCHELL BUMMER,<br><br>Defendant/Movant. | Cause No. CR 15-46-GF-BMM<br>CV 19-30-GF-BMM<br><br><br>ORDER DENYING § 2255 MOTION<br>AND GRANTING CERTIFICATE<br>OF APPEALABILITY |

This case comes before the Court on Defendant/Movant Scott Mitchell

Bummer's motion to vacate, set aside, or correct his sentence, pursuant to 28

U.S.C. § 2255.  Bummer is a federal prisoner proceeding pro se.

The Court ordered Bummer's three court-appointed attorneys to submit

affidavits responding to Bummer's allegations about plea bargaining on September

23, 2019.  *See* Order (Doc. 211) at 2; Counsel Resps. (Docs. 212, 213, 214).

Bummer has replied to the responses filed by his former counsel (Doc. 215).

## I. Preliminary Review

The Court first must determine whether "the motion and the files and

records of the case conclusively show that the prisoner is entitled to no relief."  28

U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings

for the United States District Courts.  A petitioner "who is able to state facts

1

showing a real possibility of constitutional error should survive Rule 4 review."

*Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996)

("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254

Cases). The Court should "eliminate the burden that would be placed on the

respondent by ordering an unnecessary answer."  Advisory Committee Note

(1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note

(1976), Rule 4, Rules Governing § 2255 Proceedings.

## II.  Background

### A.  Summary of the Investigation

This summary describes evidence presented at the suppression hearing and

at trial.  It is not intended to encompass all the evidence and does not find facts to

be true or false.

In the spring of 2015, detectives and undercover officers with a drug

interdiction task force were investigating Tony Amato's drug trafficking activity in

Great Falls, Montana.  Authorities believed that someone in Helena supplied

Amato with drugs. Based on this information, Detective McDuffie obtained a

federal search warrant that authorized the task force to track Amato's location up

until April 3, 2015, by monitoring his cell phone "pings."  *See* Sealed Application

and Warrant (Docs. 1, 1-1, 1-2, 1-3) & Warrant (Doc. 2), *In the Matter of the*

*Search of Information Regarding the Location of Cellular Telephone Number*, No.

2

MJ 15-08-GF-JTJ (D. Mont. Mar. 26, 2015);[1] *see also* 1 Suppression Hr'g Tr.

(Doc. 85) at 60:12–62:10 (Det. Kruse). The detectives only monitored pings that

may have indicated that Amato had traveled from Great Falls to Helena.

The task force tracked Amato's phone on April 1,2015, to a Helena business

called Montana Fluid Power. Bummer owned Montana Power Fluid. Amato

traveled to a rural residence east of Helena on April 4, 2015. One detective,

McDuffie, recognized the location as Bummer's home. Another detective, Kruse,

recognized Bummer's name from other investigations. *See* 1 Suppression Hr'g Tr.

(Doc. 85) at 17:7–21:1 (Kruse), 83:16–85:12, 92:13–93:11 (Det. McDuffie).

On April 11, 2015—more than one week after the tracking warrant had

expired—Amato traveled from Great Falls to Bummer's home in Helena. Amato

then drove to an unidentified location in Helena, and later returned to Bummer's

house. Amato next stopped at a gas station and, near Holter Lake, picked up a boat

before returning to Great Falls. Authorities surveilled Amato by helicopter and

tracked him by cell phone pings, but law enforcement officers did not know his

location at all times during the trip. Amato later testified at trial about where he

went and when. *See id*. at 25:11–26:11 (Kruse); 2 Trial Tr. (Doc. 201) at 11:1–

21:23, 24:6–24:12 (Air Interdiction Agent Dascoulias), 47:15–56:23 (Amato).

---

[1] A court may take judicial notice of its own records. *See, e.g.*, *Rand v. Rowland*, 154 F.3d 952, 961 (9th Cir. 1998) (en banc); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

Montana highway patrol officers stopped Amato as he traveled on Interstate 15 near Ulm. The officers searched Amato and found 110.3 grams of methamphetamine of 97.8% purity, or 107.8 grams of actual methamphetamine. *See* 2 Trial Tr. at 57:2–60:5 (Amato), 134:25–135:11 (forensic chemist Huntington). Amato told detectives that he had gotten the methamphetamine "in Helena from a guy named Scott." Amato identified a photograph of Bummer as "Scott." *See* 1 Suppression Hr'g Tr. at 29:23–30:8 (Kruse).

Based on Amato's statements and other information, *see* Br. in Supp. of Mot. to Suppress Ex. 1 (Doc. 52-1) (Application and Warrant); 1 Suppression Hr'g Tr. (Doc. 85) at 100:2–104:21 (McDuffie), officers detained Bummer and executed search warrants at his house and business on April 12, 2015. Officers found a scale, plastic bags, and a safe in Bummer's bedroom. Inside the locked safe, officers found a loaded revolver, another handgun, more than $7,000 in cash, a list of names and phone numbers, and 120.6 grams of methamphetamine of 98% purity, or 118.1 grams of actual methamphetamine. *See* 2 Trial Tr. (Doc. 201) at 100:7–101:7, 106:17–120:9 (Det. Hinchman), 136:13–137:6 (Huntington).

### B. Procedural History

A grand jury indicted Bummer and Amato on August 21, 2015, on one count of conspiring to distribute and possess with intent to distribute 50 grams or more of actual methamphetamine in violation of 21 U.S.C. § 846 (Count 1), and one count

of possessing 50 or more grams of actual methamphetamine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) (Count 2). *See* Indictment (Doc. 1) at 2–3. Due to the amount and type of drug alleged, conviction on either count would have subjected Bummer to a ten-year mandatory minimum sentence and a maximum sentence of life in prison. *See* 21 U.S.C. § 841(b)(1)(A)(viii).

Amato pled guilty to a lesser charge of possessing five or more grams of actual methamphetamine with intent to distribute it on September 29, 2015. The lesser charge subjected Amato to a mandatory minimum sentence of five years and a maximum of 40 years in prison. *See* Minutes (Doc. 37); Superseding Information (Doc. 35); 21 U.S.C. § 841(b)(1)(B)(viii).

The grand jury handed down a superseding indictment on October 23, 2015. The superseding indictment added a third count that charged Bummer with possessing firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3). If convicted on Count 3, Bummer would have faced at least five years in prison, to run consecutively to any other term. *See* 18 U.S.C. § 924(c)(1)(A)(i), (D)(ii).

Bummer moved to suppress the fruits of the search of his home on November 10, 2015. He argued that the warrant application contained false information and omitted adverse information about a confidential informant's credibility. After hearing two and a half hours of testimony, hosting a half-hour

phone conference discussing how to conduct the remainder of the hearing, and taking about 80 more minutes of *ex parte* testimony by government witnesses,[2] the Court denied the motion. *See* Minutes (Docs. 63, 66, 69); 2 Suppression Hr'g Tr. (Doc. 86) at 12:20–16:4.

A little over a year later, following a substitution of counsel, an evaluation of Bummer's competency, and another substitution of counsel, trial commenced on December 12, 2016. *See* Orders (Docs. 98, 104, 119); Minutes (Doc. 112, 118, 150). The jury deliberated for about two and a half hours before on December 13, 2016, finding Bummer guilty on all counts and responsible, on Counts 1 and 2, for 50 or more grams of actual methamphetamine. *See* Minutes (Doc. 154); Verdict (Doc. 160) at 1–3. Regarding forfeiture, the jury found by a preponderance of the evidence that Bummer had obtained the cash in the safe from drug trafficking and that Bummer had used some of the firearms found in or near the safe to facilitate drug trafficking. *See* Forfeiture Verdict (Doc. 163) at 1–3.

The Court adopted the presentence report without change. With a total offense level of 32 and a criminal history category of I, Bummer's advisory guideline range was 121 to 151 months on Counts 1 and 2. With a downward

---

[2] Transcripts of *ex parte* hearings are filed under seal, as the *ex parte* portion of this hearing was (Doc. 87). For unknown reasons, the docket entry corresponding to the transcript was also sealed. That is not the Court's usual practice. At oral argument on direct appeal, the parties and the appellate court appeared to believe no record was taken at the *ex parte* hearing. The Court makes a record of every hearing. *See* Fed. R. Crim. P. 12(f).

variance, the Court sentenced Bummer on Counts 1 and 2 to 120 months, the statutory mandatory minimum, plus a consecutive 60-month mandatory minimum on Count 3, for a total prison term of 180 months, to be followed by a five-year term of supervised release.  *See* Statement of Reasons (Doc. 187) §§ I(A), III; Minutes (Doc. 184); Judgment (Doc. 186) at 2-3.

Bummer appealed.  He challenged the denial of his suppression motion and his exclusion from the phone conference held between the two evidentiary hearings on the motion.  The Ninth Circuit rejected his arguments and affirmed his conviction.  *See* 9th Cir. Mem. Disp. (Doc. 204) at 2-3, *United States v. Bummer*, No. 17-30046 (9th Cir. July 20, 2018).

Bummer's conviction became final when the United States Supreme Court denied his petition for writ of *certiorari* on November 5, 2018.  *See* Clerk Letter (Doc. 207) at 1; *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012).  He timely filed his § 2255 motion on April 1, 2019.  *See* 28 U.S.C. § 2255(f)(1); *Houston v. Lack*, 487 U.S. 266, 276 (1988); Mot. § 22255 (Doc. 208) at 5 ¶ C.

### III.  Claims and Analysis

Most of Bummer's claims allege that his counsel provided ineffective assistance in various respects.  At this stage of the proceedings, Bummer must allege facts sufficient to support inferences that counsel's performance fell outside the wide range of reasonable professional assistance, *see Strickland v. Washington*,

466 U.S. 668, 687–88 (1984), and that, but for counsel's unprofessional performance, he had a reasonable probability of obtaining a better outcome, *id.* at 694. The Court addresses separately each claim raised by Bummer.

## A. Amato's Phone, Pings, and Helicopter Surveillance

Bummer alleges that the officers illegally collected cell-phone "ping" information. He argues that he had standing to challenge the tracking because the pings led to him. He also refers to the time limitation contained in the warrant, and he suggests that "[a] Court Order is not a search warrant." *See* Mem. at 27[3] (citing *Carpenter v. United States*, __ U.S. __, 138 S. Ct. 2206 (2018)); *see also Carpenter*, 138 S. Ct. at 2221–23. Bummer also mentions that Amato's passenger eluded charges.

United States Magistrate Judge John Johnston issued a search warrant, not an order, authorizing the task force to track Amato's pings on or before April 3, 2015. *See* Warrant (Doc. 2), *In the Matter of the Search of Information Regarding the Location of Cellular Telephone Number*, No. MJ 15-08-GF-JTJ (D. Mont. Mar. 26, 2015) (sealed). Bummer's counsel attached the warrant application as a sealed exhibit to the brief supporting his motion to suppress. *See* Br. in Supp. of Mot. to

---

[3] The Court's electronic filing system serially numbers each page of a document. Those page numbers are cited in this Order. Bummer numbered some of his pages with lower-case Roman numerals and others with Arabic numerals and also skipped one page number. The Court's numbers add 12 to Bummer's Arabic numbers, *e.g.*, the Court's page 25 is Bummer's page 13.

Suppress Ex. 4 (Doc. 53-2) (filed under seal). The officers needed no additional warrant to relay location information to the helicopter or to follow Amato to where the pings led.

Bummer appears to be correct about the expiration of Judge Johnston's warrant. Bummer lacks any legally cognizable claim, however, to the protection of the warrant's time limits. *See United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013) (explaining elements of standing to seek suppression). Bummer alleges no fact to suggest that he possessed a property interest in Amato's phone or its pings. *See id.* (quoting *United States v. Padilla*, 508 U.S. 77, 82 (1993) (per curiam) (disavowing "co-conspirator exception" to limitations on Fourth Amendment standing)). Bummer alleges no fact to suggest that he possessed a subjective expectation that the location of Amato's phone would remain private. *See id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Bummer certainly had a reasonable expectation of privacy in the curtilage and interior of his home. No government agent breached the curtilage.

To recognize Bummer's standing to contest the tracking of Amato's pings, the Court would have to conclude that Bummer possessed both a subjective and an objectively reasonable expectation of privacy in the geographic location and identification of his house. Assuming one can reasonably expect privacy in the existence of a place, Bummer alleges no fact to suggest that he entirely concealed

his home from view or that he received no mail or services there.  A task force detective testified that he had long known where Bummer lived.  *See* 1 Suppression Hr'g Tr. (Doc. 85) at 83:16–84:15. Nothing in the record or in Bummer's current allegations supports an inference that Bummer might have established standing to challenge the tracking of Amato's pings and location.

Bummer refers to Amato's passenger's "release from State charges."  *See* Mem. at 19.  Bummer provides no reason to infer either that she was released for reasons pertinent to him or that someone else's release from state charges establishes that his own counsel provided ineffective assistance in a federal case.

None of Bummer's claims support an inference either that counsel performed unreasonably or that Bummer had a reasonable probability of a better outcome.  Bummer's allegations fail to meet either prong of the *Strickland* test. The Court denies all claims suggesting Bummer's rights were violated by tracking Amato's pings, by relaying information to the helicopter, and by using all the information to connect Bummer to Amato. *See* Mem. at 19, 22, 27.

### B. Bummer's Arrest

Bummer asserts that the officers lacked probably cause to arrest him.  He objects that this illegal arrest supported the search of his phone, the impoundment of his truck, and his interrogation.  *See* Mem. at 17–18.  The Court will assume, for present purposes, that Bummer's detention ripened into an arrest and that the arrest

lacked probable cause. The exclusionary rule "applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980).

Bummer identifies no evidence or statement that the officers obtained from his phone, truck, or interrogation and used against him at trial. A detective testified that "the individuals who were speaking to Mr. Bummer" at the time of the search "asked if we could have the code or the key to get into the safe." Bummer "denied access." *See* Mem. at 19; 2 Trial Tr. at 108:13–108:23. No one testified that Bummer knew the code or had a key. The detectives could ask, and Bummer could decline. No legal basis for suppression of his decision not to provide a code or key emerges from the record. And, at any rate, any potentially incriminating implication of Bummer's reticence paled in comparison to what a detective found when he pried open the safe. *See, e.g.*, 2 Trial Tr. at 110:3–111:14.

Bummer was "not himself a suppressible 'fruit'" of an unlawful arrest. The assumed "illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct." *Crews*, 445 U.S. at 474. Buumer fails to meet

11

either prong of the *Strickland* test.  The Court denies this claim. *See* Mem. at 17–18, 26.

### C.  Superseding Indictment

Bummer contends that the superseding indictment adding the charge under 18 U.S.C. § 924(c) "was used to coerce Petitioner not to proceed to a *Franks* hearing and motion to suppress."  Mem. at 26.  This type of "coercion" does not violate the Constitution.  *See, e.g.*, *Brady v. United States*, 397 U.S. 742, 755 (1970) ("[A] plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty."); *United States v. Seng Chen Yong*, 926 F.3d 582, 591–92 (9th Cir. 2019) (holding that United States' promise not to prosecute defendant's son if defendant pled guilty was not unconstitutionally coercive because probable cause supported charge against defendant's son).

Bummer fails to meet either prong of the *Strickland* test.  The Court denies this claim. Mem. at 26.

### D.  Witnesses and Manner of Proceeding at the Suppression Hearing

Bummer points out that "no record" of the *ex parte* portion of the hearing on December 10, 2015, remains available to him.  *See* Mem. at 20.  The Court sealed the hearing and conducted it an *ex parte* manner. As a result, the transcript likewise is sealed and *ex parte*.

The hearing did not end "[w]ithout any testimony." *See id*. A record of the

testimony exists. Two detectives testified *ex parte* based on the controlling case law that allows the Court to decide whether the identity of a confidential informant should be disclosed to Bummer. The Court relied on this testimony in finding that knowing the person's identity would not enable Bummer to show that the warrant application contained material falsehoods or omissions. *See* 2 Suppression Hr'g Tr. (Doc. 86) at 12:20–13:10. The informant's identity remains confidential. The *ex parte* proceeding did not violate Bummer's rights. *See United States v. Napier*, 436 F.3d 1133, 1136–39 (9th Cir. 2006).

Bummer contends that the United States and his counsel violated his rights to confrontation and due process by failing to call Amato to testify at the suppression hearing. *See* Mem. at 20–21, 30. Bummer's suppression claim addressed whether the officer who applied for the search warrant knew specific exculpatory or impeaching information and yet deliberately omitted it from the warrant application. *See* Br. in Supp. of Mot. to Suppress (Doc. 52) at 2; *see Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

Counsel asserted, and Bummer continues to assert, that Amato was under the influence of methamphetamine when he identified Bummer as the person who sold him methamphetamine. Law enforcement witnesses testified about what they knew, what they inferred or should have inferred, and what they conveyed to other officers. *See, e.g.*, 1 Suppression Hr'g Tr. (Doc. 85) at 28:9–29:22, 109:2–111:7; 2

13

Suppression Hr'g Tr. (Doc. 86) at 13:11–18. Bummer's counsel also asked the Court to review the lengthy video of Amato's interview. The Court reviewed it. *See* 1 Suppression Hr'g Tr. (Doc. 85) at 66:22–67:11; 2 Suppression Hr'g Tr. (Doc. 86) at 11:8–20, 13:11–13:16. The video demonstrated what the officers saw and heard from Amato. The officers' information and conduct represented the crucial issue. Amato could not have testified about what the officers knew or should have known. Neither the United States nor Bummer's counsel violated Bummer's rights by failing to call Amato to testify.

Bummer claims that his absence from the phone conference on December 8, 2015, violated his right to be present. His arguments suggest that he believes Amato testified at the phone conference. *See* Mem. at 21–22. No one testified at the phone conference. *See* Minutes (Doc. 66); Telephonic Conf. Tr. (Doc. 197) at 1–16. The Ninth Circuit decided this issue against Bummer on appeal. *See* Mem. Disp. (Doc. 204) at 2. No evidence or allegation supports an inference that Bummer's presence had "a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1933). Bummer presents no reason to deviate from the law of the case. *See United States v. Jingles*, 702 F.3d 494, 498, 503 (9th Cir. 2012).

None of Bummer's claims supports an inference either that counsel performed unreasonably or that Bummer had a reasonable probability of a better

outcome.  Bummer has failed to meet either prong of the *Strickland*.  The Court denies all claims relating to the suppression hearing. *See* Mem. at 20–22, 30.

### E.  Decisions for Counsel vs. Decisions for Client

Bummer objects to his counsel having made certain decisions without consulting him.  The client decides the overall objective of the defense as well as whether to proceed with counsel or without counsel, whether to plead guilty or stand trial, whether to testify at trial, whether to concede guilt, and whether to appeal.  Counsel determines how to achieve the objectives defined by the client. *See, e.g.*, *McCoy v. Louisiana*, __ U.S. __, 138 S. Ct. 1500, 1508–09 (2018). Counsel provides ineffective assistance if failing to consult with the client proves both unreasonable and prejudicial to the client.  *See, e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 248 (2008) (quoting *New York v. Hill*, 528 U.S. 110, 114–15 (2000)).

Counsel does not provide ineffective assistance when he reasonably believes that the client might not be able to make rational decisions and moves for a competency evaluation to decide the matter, even if the result would be to waive a speedy trial argument for dismissal.  *See, e.g.*, Mem. at 23; *Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009); *United States v. Kaczynski*, 239 F.3d 1108, 1112 (9th Cir. 2001).

Bummer's allegations that counsel read grand jury transcripts, *see* Mem. at

23, and (yet) failed to request them, *see* Mem. at 26, 32, do not support an inference that counsel acted unreasonably or that a different outcome was realistically possible. To the extent Bummer believes the indictment or superseding indictment were predicated on hearsay, *see, e.g.*, Sentencing Tr. (Doc. 203) at 15:23–16:3, the law permits hearsay testimony before a grand jury, *see Costello v. United States*, 350 U.S. 359, 363–64 (1956), *followed in Kaley v. United States*, 571 U.S. 320, 328, 338–39 (2014).

Bummer claims that his counsel "admits that he should have moved to suppress the firearms." Mem. at 24. Counsel filed a suppression motion. If it had been granted, the firearms and everything else found in Bummer's home would have been excluded. Bummer fails to identify a firearm-specific argument for suppression. The record suggests none. Bummer also claims without explanation that counsel should have sought a continuance. *See* Mem. at 24.

Bummer's allegations fail to meet either prong of the *Strickland* test. The Court denies all allegations relating to decisions made by counsel without Bummer's input or consent. *See* Mem. at 23, 24, 26, 32.

### F. Plea Negotiations

Bummer alleges that "at no time did Counsels inform and apprise Petitioner Bummer of the benefits [of] pleading guilty or accepting a plea offer." Mot. § 2255 (Doc. 208) at 4. He states that he would have pled guilty if counsel had

adequately explained the "actual consequences," *id*. at 5, of conviction at trial. *See also* Mem. (Doc. 209) at 13–16.

Bummer refused to give serious consideration to plea offers. This refusal caused two of Bummer's counsel, and even the prosecutor, to question Bummer's competence to assist in his own defense.[4] *See* Hoovestal Mem. Oct. 8, 2015 (Doc. 96-1 at 43); Competency Hr'g Tr. (Doc. 198) at 55:7–58:7, 60:9–62:25. His third counsel, aware of Hoovestal's and Holden's doom, relayed to Bummer a fourth plea offer, but made no recommendation about it in order to let Bummer see that he was taking time to investigate the facts and law and "develop a trust relationship" that might support his later recommendations about the fifth and sixth plea offers. *See* Donovan Resp. (Doc. 214) at 4 ¶ 1(b). This appeal did not work. *See id.* at 5 ¶ 2(c), 6 ¶ 3(c), 7 ¶ 4.

To address any lingering possibility that counsel did not relay the prosecution's numerous plea offers to Bummer, the Court ordered the three counsel serially appointed to represent him to respond. The Court asked each to

---

[4] The evaluator, Dr. Miriam Kissin, noted that an assessment of Bummer's competency required her to determine whether he had a psychiatric illness and, if so, whether it contributed to the problems counsel believed he was experiencing in understanding the case. *See* Competency Hr'g Tr. (Doc. 198) at 46:23–47:5. She concluded he did not have a psychiatric illness, so the quality of his "conceptualization of what would happen in court"—or, to put it in terms of counsel's concern, whether Bummer was capable of making good decisions instead of bad decisions—was not up to her to say. *See id*. at 47:24–48:7. In fact, when Bummer told Dr. Kissin he intended to "throw all his cards on the trial," *see id*. at 48:13–21, he accurately described one of his options as well as the nature of the decision he was making, *see id*. at 48:24–49:14.

say "whether they explained to Bummer the [United States'] offers[,] . . . what course of action they recommended, and what they recall about Bummer's decision." Order (Doc. 211) at 1–2.

Each attorney responded in detail. In summary form, on November 30, 2015,[5] Hoovestal told Bummer:

> [A]ttached is the Government's final offer for resolution. . . .
> Basically it is an offer to plead to the mandatory minimum of 5-years.
> . . . If you reject this offer and lose the suppression issue, then the
> Government's offer will be to plead to the conspiracy which holds a
> mandatory minimum 10-year sentence. . . . You could, on the other
> hand, lose at trial. In that case you would receive a mandatory
> minimum 15 year sentence—10 years on Count 1 and a consecutive 5
> years on Count 3.

Hoovestal Letter (Doc. 213-3) at 1.

Counsel Holden stated:[6]

> Mr. Bummer was informed throughout my representation that if he
> proceeded to trial, I believed he would be convicted and spend a
> minimum of fifteen (15) years in jail. I specifically informed him that
> the AUSA would entertain an offer that would allow him to plead
> guilty and only spend five (5) years, binding, if he would authorize the
> plea negotiations. He refused to provide such authorization, and our
> communication broke down and I withdrew because Mr. Bummer was
> adamant on proceeding to trial in spite of my conclusion that he would
> be found guilty and that I could negotiate a five (5) year plea.

---

[5] Hoovestal says the date on the letter, November 3, is a typographical error, and the correct date was November 30. *See* Hoovestal Resp. (Doc. 213) at 5 ¶ 10 n.1.

[6] Bummer states that he did not receive a copy of Holden's response. The document shows that it was served on him. *See* Holden Resp. (Doc. 214) at 3. The clerk will provide another copy with this Order.

Holden Resp. (Doc. 214) at 1–2.

And on November 29, 2016, two weeks before trial, counsel Donovan wrote to Bummer:

> So your choice is as follows:
> **GO TO TRIAL:**      **15 year (minimum) in prison**
>
> **PLEAD GUILTY:**    **6 years (or less) in prison**
>
> In my opinion, you are taking a big risk by going to trial because, based only on the evidence found in your safe (meth, guns, cash and scale), the jury will convict you.

Donovan Letter (Doc. 212-2) at 1 (bold text in original). Donovan recalls that Bummer responded to this offer—the government's sixth—by counteroffering to plead guilty to a misdemeanor possession charge with a sentence of time served. *See* Donovan Resp. (Doc. 212) at 6 ¶ 3(c). "AUSA Betley rejected Bummer's counter-offer." *Id*.

Bummer "denies, in part, the statements made by Counsel Hoovestal and Counsel Donovan." Bummer Reply (Doc. 215) at 6. Bummer fails to identify anything he disputes in the statements. Instead, he claims (for the first time) that Hoovestal "attempted to force [him] into pleading guilty without any explanation as to the charges or the elements necessary for a conviction." Bummer Reply (Doc. 215) at 2. Hoovestal's lengthy advice letter to Bummer explained the charges and the elements of Counts 1 and 2 as well as many other aspects of the case. *See* Hoovestal Advice Letter (Doc. 96-1) at 2–21; s*ee also* Bummer Reply at

2, 4 (citing the advice letter, Doc. 96-1)).  Hoovestal's letter did not explain the charge or elements of Count 3, because it was written before the United States had obtained the superseding indictment. Hoovestal's letter warned Bummer, however, that the United States would add a § 924(c) charge with a mandatory consecutive five-year sentence if Bummer filed a suppression motion and/or rejected the plea offer pending at the time.  *See* Hoovestal Advice Letter (Doc. 96-1) at 16, 23–24. At any rate, Bummer's belated allegation about Hoovestal does not support an inference that all three of his counsel failed to explain to him why they believed he would be convicted.

Bummer's reply also reiterates some of the claims that he makes in his § 2255 motion and asserts that he would have pled guilty if all of his counsel had "litigated the issues Petitioner Bummer directed them to do so."  Bummer Reply (Doc. 215) at 6.  He believes that had they done so, the issues "would have been memorialized in the record for further proceeding as appeals under conditional plea agreements." *Id*.

This position reveals several mistaken beliefs.  First, neither the United States nor the Court were bound to agree to a conditional plea agreement if Bummer's counsel had raised all the issues that Bummer wanted them to raise.  *See* Fed. R. Crim. P. 11(a)(2).  Second, the United States did offer, in fact, a conditional plea agreement at one point.  Bummer rejected it.  *See* Hoovestal Resp.

(Doc. 213) at 5–6 ¶ 11; Prop. Plea Agreement (Doc. 213-4) at 3 ¶ 3 para. 2; Am. U.S. Trial Br. (Doc. 146) at 3 (second offer). Third, refusal by counsel to pursue meritless lines of inquiry did not compel Bummer to stand trial, because Bummer still could have alleged ineffective assistance of counsel, just as he does now. *See also* Sentencing Tr. (Doc. 203) at 12:16–23:4. Fourth, Hoovestal's candor about the strength of the prosecution's case and Bummer's ignorance of what would make a good motion or defense did not violate his duty to his client. It was exactly what the Sixth Amendment required—an honest and practical assessment of the evidence and Bummer's options.

Finally, Bummer states that, "[i]n order to force Amato's testimony to be on the record, Petitioner had no other choice but to proceed unwillingly to trial in order to bring Amato's information to light." Pet'r Reply (Doc. 215) at 3. This statement is true. Standing trial represented Bummer's only path to put Amato's testimony before the Court or a jury and obtain a decision whether Amato was telling the truth. Bummer's counsel told him repeatedly that a jury likely would believe Amato because of all the evidence found in Bummer's safe. They likely were correct. Even so, "a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence." *McCoy*, 138 S. Ct. at 1508. The client's prerogative is to decide the overall objectives of the representation, including "whether to plead guilty." *Id.* Bummer may not have gotten the verdict that he

wanted, but he got the trial that he wanted.

None of Bummer's counsel performed unreasonably by relaying all of the government's plea offers and strongly urging Bummer to accept them. Their uniform and repeated advice to Bummer, and his uniform and repeated rejection of it, amply demonstrates the lack of any realistic possibility Bummer might have pled guilty. Bummer fails to meet either prong of the *Strickland* test. The Court denies. Mot. § 2255 (Doc. 208) at 4–5; Mem. (Doc. 209).

### G. Witnesses and Evidence Presented at Trial

#### 1. Kruse and McDuffie

Bummer contends that the United States and his counsel violated his rights to confrontation and due process by failing to call Detective Kruse and Detective McDuffie to testify at trial. *See* Mem. at 24–25, 26, 30, 31. The United States listed Kruse and McDuffie as potential trial witnesses, *see* Pretrial Witness List (Doc. 149), but did not call them, *see* Final Witness List (Doc. 158).

The Constitution does not prevent the United States from making strategic decisions about which witnesses to call. Bummer describes Kruse and McDuffie as "key witnesses to the Government's theory of the entire case." *Id.* at 25. The prosecution had to prove the allegations of the superseding indictment. In some cases, how the investigation led to evidence supporting the allegations may be critical to proving the allegations. In others, such as this case, why the

investigation proceeded as it did holds only marginal interest. The key witnesses were persons who testified that they saw and/or participated in Bummer's or Amato's criminal activity, seized drugs and other evidence introduced at trial, and verified that the drugs were methamphetamine. Those witnesses testified.

As Bummer points out, his own counsel could have called Kruse and McDuffie to testify. Testimony about how the officers obtained the search warrants likely would have been cut short as peripheral to the issues at trial. *See* Fed. R. Evid. 403; Final Pretrial Conf. Tr. (Doc. 202) at 14:16–15:5. Any relevant, admissible testimony that these witnesses provided likely would have been both cumulative and incriminating. *See, e.g.*, *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (counsel need not develop evidence that is "a basket of cobras"). Whether phrased as prosecutorial misconduct or ineffective assistance of counsel, Bummer's allegations do not support an inference that anyone violated his rights. The Court denies this claim. *See* Mem. at 24–25, 26, 30, 31.

### 2. Additional Helicopter Surveillance Footage

Bummer claims the jury should have seen helicopter video footage showing Amato stopping at a residence and a casino.[7] Mem. at 26. Amato admitted in his testimony that he stopped at another residence. *See* 2 Trial Tr. (Doc. 201) at 72:9–

---

[7] Bummer also claims the prosecution did not disclose the full helicopter video. At the suppression hearing, the prosecutor noted without dispute that the full video was available at the U.S. Attorney's Office. *See* 1 Suppression Hr'g Tr. (Doc. 85) at 60:12–25.

72:17. Amato denied having stopped at a casino on April 11, 2015. *See* 2 Trial Tr. (Doc. 201) at 72:18–72:25. No party presented evidence at the suppression hearing or trial suggesting that Amato stopped at a casino. Counsel also pointed out to the jury that the helicopter "didn't follow [Amato's] red pickup truck from wherever it came to to end up here in the Helena area." *Id*. at 23:15–24:12. The video footage failed to provide a complete record of all Amato's travels on April 11, 2015. The jury remained free to infer that Amato obtained methamphetamine elsewhere—not just at a casino or residence, but anywhere else he might have stopped that day without being seen. Bummer cannot show he was prejudiced by the jury's not viewing the entire video. The Court denies this claim. Mem. at 26.

## H. Amato's Veracity

Bummer contends that Amato's statements changed and that he did not tell the truth. As Bummer points out, the Court did suggest that Amato might not be credible, *see, e.g.*, 2 Trial Tr. at 147:10–147:20 (discussing Bummer's motion under Federal Rule of Criminal Procedure 29). The jury decided the issue. And the jury knew that Amato's pretrial statements and his trial testimony differed. *See, e.g.*, 2 Trial Tr. (Doc. 201) at 67:11–68:11. For example, the jury heard him testify that he paid $3,000 for 115 grams of meth. *See id*. at 46:10–46:22; Mem. at 29. The jury heard Amato say that he paid $1,400 for 28 grams. *See id*. at 38:16–21. And the jury heard Amato testify that he sold an ounce to someone else for $1,700.

*See id.* at 45:6–45:11.

The Court does not usurp juror's credibility assessments. None of Bummer's allegations regarding Amato's lack of credibility support relief under *Brady*, *Giglio*, *Strickland*, or other authority. The Court denies all these claims. *See* Mem. at 29, 32–34.

### I. Norcutt's Veracity

Bummer avers that the prosecution failed to disclose "Norcutt's detention, arrest, cooperation, fleeing from justice, and being a fugitive from justice from June of 2015 (Norcutt's wedding) to apprehension in 2016." Mem. at 25. In fact, these matters were addressed at length at trial. *See, e.g.*, 1 Trial Tr. (Doc. 200) at 24:15–30:2, 70:22–72:23, 75:7–77:3, 82:1–94:24, 98:21–99:1, 102:22–103:11. Jurors were very unlikely to believe Norcutt was a fine upstanding man who voluntarily provided testimony free of self-interest. None of Bummer's allegations regarding Norcutt's lack of credibility support relief. The Court denies all these claims. *See* Mem. at 25–26, 29.

### J. Legal Validity of Verdicts

Bummer challenges the legal bases of the jury's verdicts on Counts 1 and 3. Bummer claims that his counsel should have sought dismissal of Count 1 because the evidence showed only a buyer-seller relationship rather than a conspiracy. Counsel did seek dismissal under Federal Rule of Criminal Procedure 29. *See* 2

Trial Tr. at 141:22–142:8. The Court denied the motion because reasonable jurors could find the existence of a conspiracy beyond reasonable doubt. *See id.* at 145:20–146:3. For instance, Norcutt testified that he fronted methamphetamine to Bummer. That testimony alone, if the jury believed it, supported the existence of a conspiracy between Norcutt and Bummer. A person who obtains methamphetamine on a front must sell most of it to others to pay the dealer for it. *See, e.g.*, 1 Trial Tr. (Doc. 200) at 48:11–49:11, 51:5–51:18, 54:21–55:18 (Norcutt); Jury Instr. No. 8 (Doc. 156 at 9). Bummer's allegations meet neither prong of the *Strickland* test. The Court denies this claim. Mem. at 28–29.

As to Count 3, the government did not accuse Bummer of using or carrying a firearm during and in relation to a drug trafficking crime. *See* Mem. at 24 (citing *Bailey v. United States*, 516 U.S. 137 (1995); *United States v. Benboe*, 157 F.3d 1181 (9th Cir. 1998)). The government accused Bummer of *possessing* a firearm *in furtherance of* a drug trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A). The terms of this charge came from the "*Bailey* fix" that Congress implemented in 1998. *See, e.g.*, *Abbott v. United States*, 562 U.S. 8, 16–17 (2010); *United States v. O'Brien*, 560 U.S. 218, 232–33 (2010). As compared to using or carrying a firearm during and in relation to drug trafficking, the "possession in furtherance" clause "clearly broadens the realm of possible conduct that qualifies for the five-year mandatory minimum sentence." *United States v. Beaudion*, 416 F.3d 965,

969 n.4 (9th Cir. 2005). Counsel certainly would have been ineffective had they advised Bummer as he now says they should have. His allegations meet neither prong of the *Strickland* test. The Court denies this claim. *See* Mem. at 24, 26–27.

### K. Forfeiture

Bummer claims that counsel should have contested forfeiture of the cash in the safe by calling Bummer's mother to authenticate and explain the origin of an $8,000 inheritance check that she wrote to him in January. *See* Mem. at 35. Forfeiture proceedings do not trigger the constitutional right to counsel. *See United States v. $292,888.04 in Currency*, 54 F.3d 564, 569 (9th Cir. 1995). "Since [Bummer] had no constitutional right to counsel" in connection with the forfeiture, "he could not be deprived of the effective assistance of counsel." *Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982) (per curiam). Bummer also could not meet the *Strickland* standards based on counsel's failure to call Bummer's mother at trial. Her testimony likely would have strengthened the circumstantial connection between Bummer and the contents of the safe. The Court denies this claim. *See* Mem. at 35.

### L. Appellate Counsel

Bummer alleges that appellate counsel provided ineffective assistance because he "did not have the intimate facts" and did not attend trial, did not "communicate diligently" with Bummer while the appeal was pending, and did not

27

raise all issues. *See* Mem. (Doc. 209) at 33–34; Bummer Aff. (Doc. 209-1) at 4 ¶¶ 30–34. The *Strickland* standard applies. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Bummer fails to identify a potentially meritorious issue that appellate counsel failed to present. His allegations meet neither prong of the *Strickland* test. The Court denies this claim.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Bummer's claims meet the relatively low threshold required for a COA.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Bummer's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 208, 209, 215) is DENIED.

2. A certificate of appealability is GRANTED.

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 19-30-GF-BMM are terminated and shall close the civil file by entering judgment in favor of the United States and against Bummer.

4. The clerk will include Counsel Holden's response (Doc. 214) with Bummer's service copy of this Order.

DATED this <u>2nd</u> day of January, 2020.

Brian Morris
United States District Court Judge